# EXHIBIT "C"

# "EXPERT REPORT OF KENNETH R. WALLENTINE"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| CAROLYN CLARK, Plaintiff, | : | |
| vs. | : | No. 1:13-cv-00079-CW |
| BOX ELDER COUNTY, *et al.*, Defendants. | : | Report of Kenneth R. Wallentine |
| | : | |

---

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

Plaintiff's Complaint

Miscellaneous Rule 26 disclosure pleadings

Brigham City Police Department report and supplements, No. 2012-006194

Box Elder County radio call audio recordings related to this incident

Deputy Austin Bowcutt training records

Box Elder County Sheriff policies relating to vehicle pursuit and use of force

Transcript of interview with Deputy Austin Bowcutt

Deputy Austin Bowcutt deposition transcript

Trooper Colby Jensen deposition transcript

Trooper Jamison Zito deposition transcript

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*            1

Transcript of interview with Deputy Cade Palmer

Transcript of interview with Sergeant Kurt Fertig

Transcript of interview with Trooper Colby Jensen

Transcript of interview with Trooper Jamison Zito

Deputy Austin Bowcutt dash cam video recordings (front and rear cameras)

Miscellaneous photographs and diagrams relating to incident

Andrew J. Scott report

Dr. Durand Beagault report

Toxicology report for Deputy Austin Bowcutt

Toxicology report for Troy Burkinshaw


Kenneth R. Wallentine states as follows:

1.        In the instant matter, I have relied upon the documents, pleadings, records, reports, and

statements previously described.  I have formed a number of opinions based upon the

aforementioned, as well as my experience, education, and familiarity with professional

publications.  I have relied on a variety of professional publications, including, but not limited to,

my own publications and court decisions cited therein.  Those opinions, and a summary of the

circumstances known or reported to me upon which those opinions are based, are set forth herein

as follows.  My opinions are based on information currently available to me, within a reasonable

degree of professional certainty, and are subject to amendment and supplementation upon receipt

of additional information.  I have provided a synopsis of events based on the documents,


*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*                2

pleadings, records, reports, and statements provided to me to help explain the circumstances and environment of the incident.

**Incident synopsis:**

At approximately 7:30 p.m. on the evening of October 26, 2012, Box Elder County Deputy Sheriff Austin Bowcutt was driving east on Utah state highway SR-13. As he came near the Bear River bridge, Deputy Bowcutt saw a man standing near a dark blue Volkswagen Jetta sedan. The man, eventually identified as Troy Clark Burkinshaw, was urinating on the west-bound side of the well-traveled road, thus committing a misdemeanor in violation of Utah Code Ann. § 76-9-702.3.

Deputy Bowcutt turned around, intending to stop and caution Burkinshaw about the violation. As Deputy Bowcutt turned, Burkinshaw got into the Jetta and drove away. Deputy Bowcutt turned on his emergency lights, signaling to Burkinshaw to pull over and stop. Burkinshaw stopped. Deputy Bowcutt walked up to the Jetta and spoke with him through the open driver side door. Deputy Bowcutt saw a small plain brown paper bag, of the size commonly used by the state liquor store, sitting on the back seat within arm's reach of the driver's seat.

Deputy Bowcutt described Burkinshaw as being nervous. He noted that Burkinshaw did not turn to talk to him; instead, Burkinshaw looked ahead and down, avoiding eye contact. Deputy Bowcutt smelled the odor of an alcoholic beverage coming from the car.

Deputy Bowcutt asked Burkinshaw for his driver license. Burkinshaw told him that he did not have his driver license with him. He told Deputy Bowcutt that his name was "Troy Clark" and gave him a date of birth. Deputy Bowcutt asked Burkinshaw to wait in his vehicle.

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*               3

Deputy Bowcutt returned to his patrol vehicle, intending to perform a computer search for a driver license in the name given by Burkinshaw. Using his in-car computer, Deputy Bowcutt was unable to find a driver license file for "Troy Clark." Just then, Burkinshaw drove away. Deputy Bowcutt's emergency lights were still activated. He began to pursue Burkinshaw and turned on his siren. Deputy Bowcutt notified the emergency dispatcher that he was in pursuit ("10-80") and he began to follow Burkinshaw. The emergency dispatcher called for other officers to go to the area to assist.

Burkinshaw continued west on SR-13, driving into Corinne. Burkinshaw was traveling at approximately 50 m.p.h. Once in Corinne, Burkinshaw slowed, signal, and turned left into a rural residential area. Burkinshaw sped up and slowed down as he drove through the residential area. Deputy Bowcutt continued to follow Burkinshaw. Burkinshaw twice stopped and turned his vehicle around, nearly striking Deputy Bowcutt's vehicle both times.

After a few minutes, Burkinshaw turned his car onto a dead end street. Deputy Bowcutt followed Burkinshaw down the street and attempted to block Burkinshaw's escape. Burkinshaw stopped. Deputy Bowcutt waited a few seconds to be sure that Burkinshaw would not take off again. Deputy Bowcutt got out of his car with his firearm drawn, intending to arrest Burkinshaw. Deputy Bowcutt yelled at Burkinshaw "get out of the car" twice.

Once Deputy Bowcutt was out of his car, Burkinshaw backed up the Jetta, and started to drive forward. It seemed that Burkinshaw was trying to drive around Deputy Bowcutt's patrol vehicle. Burkinshaw manipulated his Jetta so that Deputy Bowcutt was directly in front of Burkinshaw's vehicle. Burkinshaw began to drive straight at Deputy Bowcutt. Deputy Bowcutt

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          4

continued to shout commands for Burkinshaw to stop while pointing his weapon at the windshield of Burkinshaw's Jetta.

Burkinshaw continue to drive toward Deputy Bowcutt, striking him in the legs as Deputy Bowcutt rapidly backed away. Deputy Bowcutt repeatedly yelled "stop," "stop the car" and "police, stop the car." Deputy Bowcutt believed that Burkinshaw intended to run over him. Deputy Bowcutt fired three times at Burkinshaw through the windshield of the Jetta, hitting Burkinshaw at least once. Burkinshaw continued to drive forward striking Deputy Bowcutt on the left knee. Burkinshaw drove the Jetta approximately 50 yards down the road. Deputy Bowcutt jumped into his patrol vehicle and approached the Jetta.

When Deputy Bowcutt approached Burkinshaw again, he saw that Burkinshaw was hit and was bleeding. Deputy Bowcutt called for a medical helicopter. Deputy Bowcutt perceived that Burkinshaw died. Other officers soon arrived. They unsuccessfully attempted to revive Burkinshaw. Emergency medical responders arrived and stated that Burkinshaw was dead.

a.     **Deputy Bowcutt's initial stop to investigate Burkinshaw's actions was reasonable and was consistent with generally accepted police policies, practices and training.**

1.     The first observation that drew Deputy Bowcutt's attention to Burkinshaw was the fact that Burkinshaw was urinating in public at a time and place where many passing motorists could see him, an admittedly minor violation of Utah state law. Police officers must address circumstances as presented to them and must respond to the actions and decisions of persons committing crimes or otherwise calling for police action. Deputy Bowcutt did not know at the time that he approached Burkinshaw that Burkinshaw had been drinking alcohol or that Burkinshaw had a

bottle of vodka in the car or that Burkinshaw would lie about his name or that

Burkinshaw would flee.  At the moment that Deputy Bowcutt turned to pull

behind the Volkswagen Jetta, he was doing what a well-trained police officer

would be expected to do–talk to Burkinshaw about breaking the law and about a

more appropriate place to urinate.

2.      Perhaps by fortuity of timing or perhaps because Burkinshaw did not want to talk

to the deputy about urinating in public, Burkinshaw had pulled away from the side

of the road by the time that Deputy Bowcutt turned around.  A reasonable and

well-trained officer having just observed a misdemeanor committed in his presence

would have–at the very least–stopped and warned the violator.  In my experience,

it is common to find that persons urinating just off the side of a heavily-traveled

road, particularly one located just a short distance from a well-known, long-

established bar (Mim's Bar and Grill, just a couple of blocks down the road from

where Burkinshaw was urinating), may be persons who have consumed several

drinks and may be persons under the influence of alcohol.  A reasonable and well-

trained officer would have investigated the possibility that the urinating in public

was a clue to driving under the influence of alcohol and would have effected a

traffic stop and detention to investigate both the violation committed in the

officer's presence and the possibility of a more serious violation of driving under

the influence of alcohol.

3.      Officers are trained to identify persons who are the subject of investigations.

Deputy Bowcutt asked Burkinshaw to identify himself with a driver license.  The

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          6

video recording and Deputy Bowcutt's testimony show that the initial contact was not escalated, but was a calm discussion to further the investigation into the misdemeanor violation.

4.      Burkinshaw was obligated to carry his driver license with him while driving a car, as required by Utah Code Ann. § 53-3-217, and to produce it upon demand of a peace officer. Burkinshaw lied to Deputy Bowcutt about his name, perhaps fearing that Deputy Bowcutt would learn that Burkinshaw did not have a valid driver license and was prohibited from driving in the state of Utah and/or that a warrant was issued for Burkinshaw's arrest. Burkinshaw also avoided eye contact and kept his face turned away and down, perhaps to conceal the source of the odor of an alcoholic beverage. Whatever the reasons were for Burkinshaw's behaviors, a reasonable and well-trained officer would investigate the validity of Burkinshaw's claimed identity as "Troy Clark" and would check for a valid driver license.

5.      Once Burkinshaw mislead Deputy Bowcutt about his identity, Deputy Bowcutt returned to his patrol vehicle to perform a computer search of state driver license files. Burkinshaw decided to flee from the traffic stop and he drove away. When Burkinshaw fled, he had not been searched or conclusively identified. Deputy Bowcutt had not been able to search or even thoroughly examine the Jetta. Thus, he did not know whether Burkinshaw was hiding a gun or some other weapon.

6.      Burkinshaw's decision to flee transformed what had been at least an investigation of a minor misdemeanor with an intended warning or possibly at most an

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          7

investigation of alcohol and driver license misdemeanors into a felony with
significant potential danger.

b.   **Deputy Bowcutt's decision to pursue Burkinshaw after he fled from the initial
traffic stop and the manner in which Deputy Bowcutt pursued Burkinshaw was
reasonable and was consistent with generally accepted police policies, practices and
training.**

1.   Seeing Burkinshaw drive away, having detected the odor of alcohol and not
knowing why he was fleeing or even having conclusive identification, a reasonable
and well-trained officer would be concerned that Burkinshaw was involved in
some criminal activity beyond urinating in public. Deputy Bowcutt began to
pursue Burkinshaw. Two cameras and an audio input recorded the brief pursuit.

2.   Burkinshaw drove at substantially varying speeds through a residential and
agricultural neighborhood in rural Corinne. Though Deputy Bowcutt did not yet
know about Burkinshaw's revoked driver license or his violation of the alcohol
interlock device statute or the arrest warrant, Deputy Bowcutt did know that
Burkinshaw was committing a felony crime by fleeing in violation of Utah Code
Ann. § 41-6a-209. Deputy Bowcutt followed Burkinshaw and broadcast the name
that Burkinshaw had given him ("Troy Clark"). Deputy Bowcutt also meticulously
"called the pursuit," keeping the emergency dispatcher and other officers informed
of the turns and progress of the pursuit. Deputy Bowcutt was noticeably calm as
he reported the unfolding events. His execution of the pursuit and

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          8

communications during the pursuit was consistent with the standard POST

emergency vehicle operations training provided at the state police academy.

3.    Twice during the brief pursuit, Burkinshaw made a series of turns and maneuvers

apparently intended to further his attempted escape from Deputy Bowcutt by

reversing course.  In doing so, he nearly hit Deputy Bowcutt's patrol vehicle,

coming within "a few inches" of Deputy Bowcutt.  The primary danger presented

by Burkinshaw seemed to be intentionally directed at Deputy Bowcutt.  Still,

Deputy Bowcutt continued the pursuit, and still the recording reveals that he

maintained a calm demeanor as he tried to stop Burkinshaw.

4.    Deputy Bowcutt did not attempt a technique known as the "pursuit intervention

technique," or PIT.  This is a technique involving intentional contact between a

police vehicle and a pursued vehicle in a fashion that causes a 180-degree spin and

intended subsequent stop of the pursued vehicle.  Several factors made use of the

PIT entirely unreasonable in the circumstances presented by Burkinshaw's flight.

The PIT is prescribed on good quality paved surfaces, unlike the rural roads on

which Burkinshaw drove.  The PIT is particularly ill-advised by an officer who has

not been trained in the PIT, using a specially-modified PIT training car.  Virtually

all law enforcement agency pursuit policies that I have examined prohibit use of

the PIT by officers not specially trained and certified.  Police administrators are

taught that the Utah Administrative Code proscribes use of the PIT by any officer

not properly trained.  R728-503-7(2).  The PIT should only be used where there is

adequate shoulder space and no irrigation canals or ditches that might cause a

subject vehicle to flip and roll. Some agencies prescribe that the PIT only be used in circumstances where deadly force is justified at the time that the PIT is executed.

5.      Similar concerns are involved with ramming pursued vehicles. Police pursuit policies commonly expressly and unambiguously prohibit intentional ramming. Deputy Bowcutt was trained not to ram another car. Ramming is generally ineffective and it presents a particular danger of injury to the officer and loss of control of the vehicle due to air bag inflation. Deputy Bowcutt was wearing eyeglasses, potentially exacerbating the risk of serious injury from the burning explosion that activates an air bag.

6.      Burkinshaw mislead Deputy Bowcutt by identifying himself as "Troy Clark." Deputy Bowcutt initially accepted this claimed identity at face value and tried to verify a driver license by a computer check. Deputy Bowcutt also provided this name to the emergency dispatcher. Deputy Bowcutt never had the opportunity or sufficient information to conclusively identify Burkinshaw. A reasonable and well-trained officer would not have believed that he had sufficient information to later locate the fleeing driver, based on what Deputy Bowcutt then knew. Nor would a reasonable and well-trained officer have abandoned the pursuit in favor of a possible, but not likely, later identification when one of the significant concerns to be addressed was whether the driver was under the influence to the degree that he could not safely drive and he was endangering himself and the public.

7. After a few minutes and a circuit around one of the residential blocks, Burkinshaw went into what seemed to Deputy Bowcutt to be a narrow residential street in which he thought he could contain Burkinshaw's vehicle by blocking the road. He did so, stopping his truck across the single lane of pavement. Burkinshaw stopped his car and sat in the car.

8. Peace officers often—sometimes even daily—are constrained to act in dangerous circumstances. They often must step into, not away from, a threat. Deputy Bowcutt stepped out of his patrol vehicle into what was indubitably a more dangerous circumstance as he approached Burkinshaw in his vehicle. Deputy Bowcutt still did not know why Burkinshaw had fled. There seemed to be no apparent explanation. Nor did Deputy Bowcutt know whether Burkinshaw was armed with a gun, knife or some other dangerous weapon. Deputy Bowcutt did know that he was duty bound to protect the citizens in the Corinne neighborhood and to take Burkinshaw into custody and prevent further criminal acts if possible.

c. **The force used by Deputy Bowcutt to stop Burkinshaw at the point that Deputy Bowcutt believed that Burkinshaw had ended his flight was reasonable and was consistent with generally accepted police policies, practices and training under the circumstances known to him and reasonably believed by him.**

1. Deputy Bowcutt paused before getting out of his patrol vehicle to approach Burkinshaw. Deputy Bowcutt believed that Burkinshaw was done running. He drew his firearm and got out of the patrol vehicle, shouting commands to Burkinshaw to get out of the car. As Deputy Bowcutt got closer to Burkinshaw,

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          11

Burkinshaw began to drive forward. Deputy Bowcutt was in front of the car. At that point, he did not believe that Burkinshaw would continue to drive. Deputy Bowcutt believed that Burkinshaw would do what a "reasonable person would do," that is, simply stop. Police officers directing traffic and making traffic stops stand in front of cars often, giving verbal commands or making gestures for drivers to stop. In fact, reasonable persons do stop.

2. Burkinshaw did not stop. He drove straight at Deputy Bowcutt. The video recording shows the frightening scene of Burkinshaw advancing his two full tons of vehicle and contents directly at Deputy Bowcutt as Deputy Bowcutt tries to escape by backing away as quickly as he can. Deputy Bowcutt continued to shout commands at Burkinshaw, with no apparent effect. Deputy Bowcutt reported: "I've never screamed louder in my life."

3. Deputy Bowcutt "couldn't even feel [him]self walking backwards. . . . I knew I was going backwards, I know he was pushing me with the car." Deputy Bowcutt stated that he was "moving backwards as fast as I could. If I would have slowed down to move left or right, he would have hit me." Lateral movement would have required fractions of seconds that were not available to Deputy Bowcutt. The slightest slowing or simple stumble would likely have put Deputy Bowcutt right under the crushing force of Burkinshaw's car.

4. Once Deputy Bowcutt retreated past the parked location of his patrol vehicle, Burkinshaw could have driven to the side of Deputy Bowcutt, instead of driving straight forward at Deputy Bowcutt. Of course, Burkinshaw could also have

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          12

stopped the car and surrendered. But he did not. Deputy Bowcutt became increasingly convinced that Burkinshaw intended to kill him by running him over. Deputy Bowcutt stated: "why the hell was this guy tring to kill me for peeing on the side of the road?" Deputy Bowcutt perceived that Burkinshaw was trying to accelerate, perceiving that Burkinshaw was "revving" his car. "When I heard that engine start to accelerate, he was going to kill me. . . . he could have chosen to go around me, and he was going to kill me."

5.   Deputy Bowcutt could feel the bumper of Burkinshaw's car pushing against his leg as Burkinshaw drove into him. When Deputy Bowcutt felt certain that, "I was going to get run over, I was going to get killed or seriously injured, I did shoot."

6.   Deputy Bowcutt did not have the luxuries of time or distance as Burkinshaw closed in on him, pushing him backwards. Faced with the circumstances in which Deputy Bowcutt found himself at that moment, a reasonable and well-trained officer would have fired his weapon at Burkinshaw.

d.   **Plaintiff's suggested alternative actions were not reasonable.**

1.   I have considered whether Deputy Bowcutt's actions were consistent with those of a reasonable and well-trained law enforcement officer. However, plaintiff suggests several actions that an officer might have taken that were just not reasonable options. Deputy Bowcutt did not attempt to shoot the tires on Burkinshaw's Jetta. Shooting tires is the stuff of uninformed and ignorant fantasies of police work, fueled by the entertainment media industry. Effectively shooting a moving tire to deflate it, even a tire on a slowly moving vehicle, is no easy feat. Attempting to

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          13

shoot and deflate a tire presents tremendous risk that the bullet will miss and/or will travel through the tire and continue on to hit something or someone not intended as a target. Other risks include the very high likelihood of an unpredictable and uncontrolled ricochet of the bullet as it strikes the steel of the wheel and/or the gravel or pavement. Many police pursuit policies prohibit shooting at tires, or at the very least–as is the case with the Box Elder County Sheriff policy–contain stringent cautionary and restrictive language. It is conceivable that there are circumstances when it could be reasonable to shoot at tires in an attempt to stop a vehicle. Deputy Bowcutt was not presented with such circumstances. Moreover, deflating tires may well slow a vehicle but not stop it. I have seen cars continue to drive at a fairly high speed–and with less control available to the driver–on a deflated tire. I have driven a similarly-sized sedan at 65 miles per hour with a deflated tire and maintained enough control to steer the vehicle. Burkinshaw could have likely done the same.

2. It is equally nonsensical to posit that shooting into the engine compartment will result in a quick disabling of the vehicle. It does happen, but generally either on the streets of Afghanistan where multiple .50 caliber bullets are fired in rapid sequence from a military weapon or on the streets of Hollywood where motion picture special effects and visual trickery are employed.

3. Plaintiff's implication that Deputy Bowcutt could have slashed the tires on Burkinshaw's moving car passes all measure of rationality. Moreover, as noted above, Burkinshaw could have continued to drive with a deflated tire. His

Volkswagen Jetta sedan was only marginally less effective as a potentially deadly tool with a deflated tire or tires.

e.   **The Box Elder County Sheriff's Office policies governing pursuit procedures were reasonable and were consistent with generally accepted police policies, practices and training.**

1.   Police training in the state of Utah is governed by the Utah Peace Officer Standards and Training Division ("POST"). There are a few discrete subject matters where POST exercises broad authority over the curriculum, deliver of training and applicable policy. Vehicular pursuit is a subject matter where POST prescribes guidelines for agency policy and where POST not only prescribes but also provides the actual training.

2.   I have trained many police administrators, commanders and supervisors on the rules and standards prescribed for police pursuit policies in Utah. The Box Elder County Sheriff's Office policies governing pursuit procedures address the considerations that police administrators in Utah are trained by POST to address in a public safety agency's policies governing pursuit procedures, as provided in Utah Code Ann. § 41-6a-212 and Utah Administrative Code Rule R728-503.

f.   **The Box Elder County Sheriff facilitated appropriate emergency vehicle operations training for Deputy Bowcutt.**

    1.   Deputy Bowcutt began his public safety career as a correctional officer. He later attended a law enforcement academy and became certified as a law enforcement officer by the State of Utah POST in April 2006. He attended a POST-authorized and supervised training academy on the campus of Weber State University.

    2.   Pursuit driving training is mandated by POST. Moreover, POST requires that law enforcement trainees attending any of the state's sanctioned law enforcement academies attend emergency vehicle operations training at the POST facilities in Salt Lake County. Both classroom and multiple practical exercises are conducted at the POST emergency vehicle operations driving range and track.

    3.   Deputy Bowcutt successfully completed the POST emergency vehicle operations curriculum as part of the core requirements for graduation from the Weber State University Police Academy. This training is the same training provided to all law enforcement officers in the state of Utah. Deputy Bowcutt continued to have training in various aspects of driving, including training at the Box Elder County Sheriff's Office just a few weeks prior to this incident.

g.   **The Box Elder County Sheriff use of force policy is consistent with constitutional principles taught to law enforcement officers throughout the nation and is consistent with generally accepted police policies, practices and training.**

    1.   Law enforcement agencies across the nation, local, state and federal, premise their respective policies governing the use of force on bedrock constitutional principles

articulated in the Fourth Amendment and in United States Supreme Court

decisions such as *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*,

490 U.S. 386 (1989). Those principles provide that an officer may use force that

is both reasonable and necessary to effect an arrest or detention.

2. The core of the Box Elder County Sheriff policy governing use of force provides

   that:

> a deputy may threaten or use "force against another when and to the extent
>
> that he reasonably believes that such force is necessary to defend himself . .
>
> . against such other's imminent use of unlawful force; however a [deputy[
>
> is justified in using force which is intended or likely to cause death or
>
> serious bodily injury only if he reasonably believes that the force is
>
> necessary to prevent death or serious bodily injury to himself or a third
>
> person, or to prevent the commission of a forcible felony."

This policy statement is consistent, and in many respects identical, to use of force

policy foundations widely in use in law enforcement agencies throughout the

nation. Obviously founded on Utah statutes and on constitutional limitations on

use of force by police, it is consistent and harmonious with best practices for policy

and training for law enforcement agencies in the United States.

3. Some law enforcement agencies offer prescriptive or mandatory guidance beyond

   the constitutional parameters for use of force. The Box Elder County Sheriff has

   chosen to do so, limiting, for example, shooting at moving vehicles.

4.  The Box Elder County Sheriff proscribes firing at moving vehicles if there is a substantial likelihood that the bullet will strike any person other than the intended target or if the risk of loss of control of the vehicle is less than the risk presented by shooting.  This policy recognizes the difficulty in stopping nearly two tons of steel, fabric, rubber and plastic with a bullet weighing less than one-half ounce, while still posing a significant threat of a missed shot and/or an unpredictable ricochet.

2.  In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.  **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement.  I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.  I became certified as a law enforcement officer in the State of Utah in 1982.  My duties include direct supervision and command of various investigative units and agents throughout the State of Utah, supervising approximately thirty-five law enforcement

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          18

officers, forensic specialists, and technicians, as well as approximately one dozen part-time peace

officer employees. I command the State of Utah Child Abduction Response Team. I command

the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of

Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex

violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's

Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related

to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I

continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy

curriculum currently in use for several subjects, including, but not limited to, use of force,

reasonable force, use of force and police service dog teams, search and seizure, search and seizure

for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the

Basic Training programs of the Utah State Police Academy. I regularly teach in the following

specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy,

Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First

Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler

Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog

handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to

provide instruction and evaluation services for the POST Police Service Dog program. I am a

certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms

courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am

a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*              19

Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I chaired the committee of chiefs, sheriffs and other law enforcement officials who revised the model guidelines for Utah law enforcement agency pursuit policies.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I was the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*                20

state law enforcement agencies.  These policies serve as a model for all Utah public safety

agencies.  I am the author of a number of model policies for law enforcement agencies, and have

provided policy drafting and policy review services for several agencies, including policy drafting

responsibility for large law enforcement agencies.  I have served as a contract consultant to the

United States Department of Justice, assigned to provide technical assistance and management

consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities.

Professional activities pertinent to law enforcement include serving as a Past-President of the

Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member

of the International Association of Law Enforcement Educators and Trainers Association,

member of the International Association of Chiefs of Police and the Utah Chiefs of Police

Association, member of the National Tactical Officers Association, member of the International

Association of Law Enforcement Firearms Instructors, member of the International Association of

Directors of Law Enforcement Standards and Training, member of the International Law

Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace

Officers Association, member of the United States Police Canine Association, past member of the

board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-

Chairman of the Utah Law Enforcement Legislative Committee.  I formerly served as a

gubernatorial appointee to the Council on Peace Officer Standards and Training.  I currently

frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training

under appointment by the Utah Attorney General.  I am a former member of the Scientific

Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices

organization sponsored by the Federal Bureau of Investigation, the Department of Homeland
Security, and the Transportation Security Administration, with support coordinated by the
International Forensic Research Institute at Florida International University.  I have been a
presenter at a variety of professional conferences and seminars, including presenting on use of
force training at the annual convention of the International Association of Chiefs of Police and the
International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the
International Police Canine Conference.  My principal responsibilities are to provide use of force
training, civil liability instruction, and search and seizure instruction.  I have provided police
service dog training and certification standards consultation for two police service dog
organizations, including a western regional group and one of the major national groups.  I serve
as a consultant for the California Narcotic and Explosive Canine Association and have been a
featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy
formulation and revision for public safety agencies and policy-based training, responsible for
reviewing and editing the work of legal staff in creation of policy manuals for law enforcement
agencies.  In that capacity, I have assisted in the drafting and review of use of force and police
service dog policies in current use by more than 1,400 police agencies and correctional facilities in
the United States.

10.     **My publications (limited to ten years) include the following:**  I have previously
published a number of other professional articles, many of which have been subjected to peer
review.  My most recent book, *The K9 Officer's Legal Handbook*, 2nd ed., was published by

Lexis/Nexis Matthew Bender in 2014. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders,* was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *My Story of Below 100*, Law Officer, July 2013; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March 2003; *Life in the Law*

(BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; and a variety of columns addressing law enforcement issues and published by PoliceOne.com.  I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).  This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Campbell & Gemperline v. City of Springboro et al.*, No. 1:08-cv-00737, United States District Court for the Southern District of Ohio, 2013.  Deposition testimony given on behalf of the defendants. *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee,

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          24

2013. Deposition testimony given on behalf of the defendants. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants. *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of Florida, 2012. Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.*, No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. *Cavanaugh v. Woods Cross City, et al.*, No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          25

given on behalf of the defendants. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of defendants. *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          26

upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

CONCLUSION

On October 26, 2012, Troy Clark Burkinshaw set in motion a series of events that resulted in tragedy. Deputy Bowcutt properly approached Burkinshaw to investigate the minor crime of urinating in public. Deputy Bowcutt appropriately responded to Burkinshaw's increasingly serious and dangerous behavior as Burkinshaw fled, lead Deputy Bowcutt through the Corinne neighborhood and ultimately drove his car at Deputy Bowcutt, ignoring Deputy Bowcutt's commands and pleas to stop. All recognize that the outcome of Burkinshaw's decision to flee from the deputy and the ensuing encounter was undeniably sad.

Kenneth R. Wallentine
January 13, 2014

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123

*Clark v. Box Elder County, et al.*
*Report of Kenneth R. Wallentine*          28